UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AUREL SMITH, #02-A-6279,

                                    **REPORT AND**
                                    **RECOMMENDATION**

                      Plaintiff,

v.                                                               13-CV-00447(JLS)(JJM)

MARK BRADT, et al.,

                      Defendants.
_____

        The remaining claim in this 42 U.S.C. §1983 action centers on plaintiff's exposure to environmental tobacco smoke ("ETS") or second-hand smoke, while housed in double bunk cells at the Attica Correctional Facility with alleged chronic smokers from November 1, 2012 to January 1, 2013. Amended Complaint [19-1], Count 1; Hughes' Statement of Undisputed Facts [99-1], ¶24. [1] Williams Hughes, Attica's Deputy Superintendent of Security, is the sole remaining defendant. Hughes' Statement of Undisputed Facts [99-1], ¶¶24, 34. Before the court is Hughes' motion for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56 [99], which has been referred to me by for initial consideration [37]. [2] Having reviewed the parties' submissions [99, 102, 106-08], I recommend that the motion be granted.

---

[1]     Bracketed references are to the CM/ECF docket entries, and page references are to numbers reflected on the documents themselves rather than to CM/ECF pagination.

[2]     The case as initially assigned to District Judge Richard J. Arcara, who referred the case to me to hear and report upon dispositive motions [37]. Thereafter, the case was twice reassigned - initially to District Judge Lawrence J. Vilardo [56], and then most recently to District Judge John L. Sinatra, Jr. [109].

## BACKGROUND

On October 25, 2012, plaintiff arrived at Attica, and after being determined to be medically suitable, was placed in a double occupancy cell on November 1, 2012. Hughes' Statement of Undisputed Facts [99-1], ¶¶25, 27, 28. He was then transferred to different double occupancy cells on November 25 and December 28, 2012, before being placed in a single occupancy cell on January 1, 2013. Id., ¶¶29-31.[3]

Plaintiff, a non-smoker with asthma, alleges that each of his cell mates while he was housed in double occupancy cells were chronic smokers. *See* Plaintiff's Declaration [106-2], ¶¶6, 7, 18 ("[m]y cellmate in 0B-14-04T smoked upwards of one cigarette every twenty minutes for an entire day, every day"); 25 ("[m]y first cellmate at 0B-21-03B was also a chronic smoker who smoked almost as much as my cellmate in 0B-14-04T"); 37 ("my cellmate in 0B-21-03B was replaced with another chronic smoker who smoked just as much as my prior cellmate in that cell"). While housed in the initial double occupancy cell, plaintiff was assigned to the top bunk, and he alleges that the second-hand smoke would rise and remain in the poorly ventilated cell, rendering it "inescapable". Id., ¶¶20-21.

Indoor smoking at Attica was banned since approximately 2001. Hughes' Statement of Undisputed Facts [99-1], ¶132. Hughes states that security personnel under his control were instructed to write misbehavior reports to inmates caught violating the no smoking policy, and that such reports were written during his tenure. Hughes' Declaration [99-4], ¶30. According to Hughes, it was "[g]enerally . . . difficult to catch an inmate smoking". Id., ¶32.

---

[3]   Plaintiff's path was not out of the ordinary. Because of the lack of cells, the standard procedure for incoming inmates to Attica was to be housed in double bunk cells for 60 days following their arrival. Hughes' Statement of Undisputed Facts [99-1], ¶144.

Plaintiff alleges that he began complaining about being housed in a cell with a smoker in November 2012 with letters to both Hughes and Attica's Superintendent, Mark Bradt, but received no response. Id., ¶14. According to Hughes, the first letters that plaintiff wrote to he and Superintendent Bradt were dated December 3, 2012. Hughes' Statement of Undisputed Facts [99-1], ¶¶32-33. By Memorandum dated December 5, 2012, Superintendent Bradt informed plaintiff that his December 3, 2012 letter had been referred to Hughes, and that all future correspondence should be directed to Hughes. Id., ¶35. Although plaintiff did not receive a subsequent response from Hughes and did not speak to Hughes about being double celled with chronic smokers, he sent no further correspondence to Hughes. Id., ¶¶36-38. Hughes does not recall receiving or reviewing any correspondence from plaintiff. Id., ¶40.

Plaintiff's first sick call request related to ETS exposure was dated December 6, 2012.[4] At that time, he stated "I am experiencing nausea, sinus congestion, sore throat, headaches, flem [*sic*], shortness of breath, some dizziness, complications with my asthma (increased need to use my inhaler, weezing [*sic*], and tightness in the chest), and some loss of my normal appetite. I believe that it has to do with my cellmate who is a chronic smoker". Id., ¶73. When he was seen for those complaints by medical staff on December 7, 2012, he stated that he was able to get relief from his asthma symptoms by using albuterol, and his lungs were determined to be clear with oxygen levels of 98%. Id., ¶76. Although he believed at that time that the symptoms he was experiencing were the result of a cold or illness (id., ¶77), he testified that after his symptoms persisted, he no longer believed that it was attributable to a cold or illness. Plaintiff's deposition transcript [99-3], p. 35 of 100 (CM/ECF).

---

[4]  Although plaintiff was seen by medical staff on November 13, 2012 for dry skin, the treatment notes do not reflect any respiratory complaints. Hughes' Statement of Undisputed Facts [99-1], ¶¶68-69. Likewise, on December 3, 2012, plaintiff wrote a letter to Attica's Nurse Administrator about the medical care he was receiving, but did not mention any respiratory issues. Id., ¶¶70-72.

Plaintiff was next seen on December 21, 2012 for complaints of increased asthma symptoms (Hughes' Statement of Undisputed Facts [99-1], ¶81), but made no further complaints to medical staff about his exposure to ETS after he was moved to a single cell on January 1, 2013. Id., ¶86. Plaintiff acknowledges that he has never been diagnosed with any medical problem related to his exposure to ETS. Id., ¶88.

Physician's Assistant Alicia Schunk, who treated plaintiff during this time period, states that "[a]t most, [plaintiff's] complaints are suggestive of temporary discomfort caused by exposure to an asthma trigger, and/or symptoms of respiratory illness". Schunk Declaration [99-5], ¶45. She further states that "nothing in Plaintiff's medical records indicates this exposure was life threatening, serious, or that it caused any long-term health consequences". Id., ¶42. Likewise, plaintiff's own expert, Anthony Buscaglia, MD, FCCP, FAASM, states that plaintiff's "symptoms were very consistent with a history of exposure to [ETS] in a patient with pre-existing asthma", but that he "would not anticipate any change in [plaintiff's] diagnosis or condition based on the relatively short duration of exposure. Additional history and possibly pulmonary function testing would be required to comment further on his current status and prognosis". [107], p. 13 of 13 (CM/ECF).

Plaintiff alleges that he filed grievances on December 10 and 17, 2012 concerning being celled with a smoker, but received no response to either grievance. Plaintiff's Declaration [106-2], ¶¶38-42. However, he claims that on January 5, 2013, he was called out of his cell and questioned about his grievances, including those concerning his exposure to ETS, and that during the questioning, he was punched in the stomach and chest and told to "mind your own fucking business" and to stop the "writing campaign" or he would be hurt and "set up and sent to SHU with a new weapons charge". Id., ¶¶49-52. He contends that this incident prevented him from

-4-

following up on or appealing his prior grievances. Id., ¶55.  Plaintiff did not file another grievance until May 2013, and when he finally did so, he was not fearful of retaliation because it did not address the conduct of any individual officer, but instead only took issue with a prison policy. Id., ¶¶56-57. However, a month later on June 25, 2013, he filed a grievance directly against Hughes for his alleged improper denials of plaintiff's right to attend religious services. [99-8], p. 81 of 147 (CM/ECF), Bates no. 000711.

Hughes moves for summary judgment, arguing that he had no personal involvement in the alleged Eighth Amendment violation, that plaintiff failed to exhaust his administrative remedies, and that plaintiff's exposure did not violate the Eighth Amendment. Otherwise, Hughes argues that he is entitled to qualified immunity.

## DISCUSSION

### A.  Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". Rule 56(a). The movant-*i.e.*, the party seeking summary judgment-has the initial burden of showing that there is no genuine dispute of material fact. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It may satisfy this burden by relying on evidence in the record, "including depositions, documents . . . [and] affidavits", Rule 56(c)(1)(A), or by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim". Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) (*citing* Celotex, 477 U.S. at 322–23).  *See* Rule 56(c)(1)(B). Once the movant has satisfied its initial burden, "the nonmoving party must come forward with specific facts" showing that there is a genuine dispute of material fact. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B.     Personal Involvement**

Merely "because a person has the power and opportunity to violate an inmate's constitutional rights, or to cure a violation by others, does not make that person liable for an alleged violation." Beyah v. Scully, 1994 WL 549567, *3 (S.D.N.Y. 1994). "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Personal involvement is established where "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

"Under any theory of personal involvement, the plaintiff must show that a responsible official knew or had a reason to know of a constitutional violation and failed to take reasonable steps to prevent the violation." Scott v. Hollins, 2006 WL 1994757, *7 (W.D.N.Y. 2006). As I previously stated in recommending the dismissal of Superintendent Bradt for lack of personal involvement, "'[t]he general rule is that if a supervisory official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter.'" Smith v. Bradt, 2016 WL 11257425, *4 (W.D.N.Y. 2016), adopted, 2018 WL 2303781 (W.D.N.Y. 2018). *See*

*also* Blalock v. Jacobsen, 2014 WL 5324326, *9 (S.D.N.Y. 2014) ("if a supervisor merely received information of unconstitutional acts but reasonably acted upon it such as by forwarding a complaint to a subordinate for investigation and response, that does not establish personal involvement"). "If, however, the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved." Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009).

Hughes points to Sanchez v. Graham, 2016 WL 5854551, *6 (N.D.N.Y.), adopted, 2016 WL 5852511 (N.D.N.Y. 2016), as being "precisely on point". Hughes' Memorandum of Law [99-2], p. 7. There, it was undisputed that the Deputy Superintendent of Security of the Auburn Correctional Facility did not "directly participate[ ] in the decision to assign Plaintiff to a double cell", and did not "recall receiving the . . . letter that Plaintiff allegedly sent to him [concerning the conditions of his confinement], but state[d] that he did not personally investigate any inmate letter complaints and would forward them to an appropriate department". Sanchez, 2016 WL 5854551, *6. Under these circumstances, the court dismissed the claims for lack of personal involvement. Id.

While those facts generally track the facts here, the following additional facts render Sanchez distinguishable. Here, Superintendent Bradt issued a Memorandum specifically referring the matter to Hughes, and Hughes states that "under no circumstances would I ignore a complaint that was . . . referred to me by Superintendent Bradt". Hughes' Declaration [99-4], ¶22. *See also* Hughes' deposition transcript [108-1], p. 17 of 31 (CM/ECF) ("[i]f [the complaint] was sent by the superintendent . . . I would always do something"). Hughes states that even if he had reviewed plaintiff's letters, he "would have delegated the task of investigating whether Plaintiff's complaint had merit to the sergeant assigned to oversee the block of the facility where

-7-

Plaintiff was housed", and would not "taken any action other than delegating the responsibility of investigating his complaint to a subordinate". Hughes' Declaration [99-4], ¶¶23, 24. However, Hughes testified at his deposition that "I've been *in charge of investigating* something where I sent it to the subordinates to be investigated and then I wrote a response". [108-1], p. 17 of 31 (CM/ECF) (emphasis added). He explained that "if it was just a small issue, I may just tell [the subordinate to] take care of this and handle it", but for "[a] more serious incident I would ask for something back in writing [from the subordinate] and make him interview the complainant". [106-3], p. 10 of 88 (CM/ECF).

Although Hughes has no recollection of plaintiff's complaints, given his testimony that he would have done something with a complaint referred to him by Superintendent Bradt and that he took "charge of investigating" some of the more serious inmate complaints, giving plaintiff every favorable inference (as I must), I conclude that there exists sufficient issues of material fact concerning Hughes' personal involvement to preclude me from deciding this issue as a matter of law.

C.   **Failure to Exhaust**

The Prison Litigation Reform Act ("PLRA") "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." Ross v. Blake, __ U.S.__, 136 S. Ct. 1850, 1854-55 (2016) (*quoting* 42 U.S.C. §1997e(a)). If defendants meet their "initial burden of establishing . . . that a grievance process exists and applies to the underlying dispute . . . . administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors - for example, threats from correction officers - rendered a nominally available procedure unavailable as a matter of fact." Hubbs v. Suffolk County Sheriff's Department, 788 F.3d 54, 59 (2d Cir. 2015). *See* Ross, 136

S.Ct. at 1860 (administrative remedies are unavailable, *inter alia*, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").

"The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004). Hence, "[a] generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies." Lewis v. Wasielewski, 2018 WL 4732755, *6 (W.D.N.Y.), adopted, 2018 WL 4692476 (W.D.N.Y. 2018). "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). "Accusations which are 'unsupported' and 'stand alone' are similarly insufficient." Jackson v. Downstate Correctional Facility, 2018 WL 3650136, *6 (S.D.N.Y. 2018).

Plaintiff does not dispute that a grievance process existed. In fact, he alleges that he filed grievances on December 10 and 17, 2012 concerning being celled with a smoker, but received no response to either grievance. Plaintiff's Declaration [106-2], ¶¶38-42.[5] However, plaintiff contends that the grievance process was rendered unavailable to him by the assault and threat of retaliation, which prevented him from following up on or appealing his prior grievances. Id., ¶55. Hughes argues that plaintiff's claim that he was assaulted and threatened "'stand alone and are unsupported'". Hughes' Memorandum of Law [99-2], pp. 16-17 (*quoting* Winston v. Woodward, 2008 WL 2263191, *9 (S.D.N.Y. 2008)). He points to a variety of

---

[5] "It is well-settled . . . that even when an inmate files a grievance and receives no response, he must nevertheless properly exhaust all appeals before his grievance is considered exhausted." Richardson v. New York State Department of Corrections, 2014 WL 3928785, *7 (S.D.N.Y. 2014), aff'd, 633 Fed. App'x 816 (2d Cir. 2016). Here, Hughes disputes that plaintiff filed any grievances. *See* Fuller Declaration [99-7], ¶¶8, 9, 13.

factors as to why it is incredible that plaintiff could not identify at least one of the officers involved in the alleged assault, including that plaintiff remained housed on B-block for at least another month after the alleged assault and remained at Attica for at least a year thereafter, is in possession of the January 5, 2013 log book for B-block identifying the individuals working there that day, and that Attica's security personnel wore name tags. Id. at p. 14.

"Courts generally review claims of retaliation by prisoners with skepticism because of the ease with which a retaliation claim may be fabricated." Khudan v. Lee, 2016 WL 4735364, *6 (S.D.N.Y. 2016). Hence, "[a]llegations of threats are conclusory where a plaintiff's allegation does not indicate who threatened him, when he was threatened, or how he was threatened." Rodriguez v. Cross, 2017 WL 2791063, *8 (N.D.N.Y.), adopted, 2017 WL 2790530 (N.D.N.Y. 2017). Here, plaintiff offers some specifics - namely, the when and how. However, he does not identify any of the individuals responsible for the assault and threat. This is somewhat confounding, since even if plaintiff was unable to identify the individuals on the day in question from their name tags, plaintiff continued to reside on B-block for approximately a month thereafter and was provided with a list of the officers working on B-block that day. Hughes' Statement of Undisputed Facts [99-1], ¶¶128-31.

Nor does plaintiff offer any evidentiary support for his allegations. *See* Litchmore v. Williams, 2013 WL 3975956, *6–7 (S.D.N.Y. 2013) (concluding that there was not a sufficient basis in the record to conclude that administrative remedies were unavailable, where the plaintiff alleged that his appeal was "obstructed", but offered "no evidence . . . that [it] was actually mailed, intercepted, or ignored").

"Where an inmate files a grievance or appeals a grievance determination after having received threats or suffered retaliation, the inmate's conduct directly cuts against an argument that administrative remedies were unavailable to the inmate." Aikens v. Jones, 2015 WL 1262158, *6 (S.D.N.Y. 2015). Here, plaintiff filed a grievance directly against Hughes six months later ([99-8], 81 of 147 (CM/ECF), Bates no. 000711), and offers no explanation for why he no longer feared retaliation at that point.

I recognize that "[e]xhaustion under the PLRA, even when the facts are disputed, is a matter for the Court to decide." Allen v. Keanen, 2019 WL 1486679, *2 (W.D.N.Y. 2019).[6] However, it is unnecessary for me to resolve whether plaintiff's failure to exhaust can be excused, because, for the reasons discussed below, I conclude that Hughes has established his entitlement to summary judgment on plaintiff's Eighth Amendment claim.

**D.       Eighth Amendment Claim**

"[P]rison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment." Davidson v. Desai, 2019 WL 125999, *25 (W.D.N.Y. 2019). Although "the Eighth Amendment does not categorically protect an inmate from any exposure to second-hand smoke", Baker v. Moore, 2016 WL 7493956, *2 (D. Conn. 2016), "exposure to secondhand smoke can give rise to an Eighth Amendment violation", where "the exposure created an 'unreasonable risk of serious damage' to inmates' future health, and that prison officials were deliberately indifferent to that risk". Jones v. Goord, 435 F. Supp. 2d 221, 249 (S.D.N.Y. 2006) (*quoting* Helling v. McKinney, 509 U.S. 25, 35 (1993)).  Courts

---

[6]   Hughes asks that if I am unable to grant summary judgment on this issue of exhaustion that a non-jury evidentiary hearing be scheduled to resolve that dispute.  Hughes' Memorandum of Law [99-2], p. 17 n. 5.

differentiate "between claims alleging present harm due to ETS exposure, and those complaining of future harm caused by exposure to second hand smoke". Johnson v. Fischer, 2015 WL 670429, *27 (N.D.N.Y. 2015). In support of his motion for summary judgment, Hughes argues that "[t]here is simply no evidence that whatever past ETS exposure Plaintiff complains of affected his present or future health in any way". Hughes' Memorandum of Law [99-2], p. 20.

### 1.  Present Harm

"ETS claims of present harm are analyzed, like other Eighth Amendment medical claims, pursuant to the framework set out in Estelle v. Gamble, 429 U.S. 97 (1976)." Grayson v. Courtney, 2018 WL 6933296, *8 (N.D.N.Y. 2018), adopted, 2019 WL 110951 (N.D.N.Y. 2019). The "deliberate indifference" standard has both objective and subjective components. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).

To satisfy the objective component, the alleged medical need must be "sufficiently serious." Id. A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain". Id. "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

"Mild, non-life threatening respiratory conditions that do not require hospitalization are generally insufficiently serious for Eighth Amendment purposes." Davidson v. Desai, 2019 WL 125999, *31 (W.D.N.Y. 2019). Plaintiff has not established anything more: at most, he testified that he experienced congestion and other cold like symptoms during the two-month period at issue. Plaintiff's deposition transcript [99-3], pp. 31-33, 35 (CM/ECF).  As

demonstrated by plaintiff's health records from the periods prior to (May 2010 - September 2012) and subsequent to his alleged exposure to ETS (January - August 2013), plaintiff exhibited similar symptoms on a variety of occasions. *See* Schunk Declaration [99-5], ¶39.

Nor is there any evidence that plaintiff suffered any appreciable respiratory issues. In fact, his peak expiratory flow rate tests indicated that from July 2010 to July 2013, his respiratory function *improved*. Schunk Declaration [99-5], ¶¶11, 15, 16. Though plaintiff reported on December 7, 2012 having experienced an increase in his asthma symptoms over the past several weeks, he reported symptom relief with albuterol. Hughes' Statement of Undisputed Facts [99-1], ¶75. At that time, plaintiff's oxygen levels were also at 98%, his lungs were clear bilaterally, and was not experiencing any respiratory issues. Id., ¶76.

Moreover, plaintiff acknowledges that he has never been diagnosed with any medical problem related to his exposure to ETS. Id., ¶88. While plaintiff may have experienced symptoms that "caused him discomfort and worry", there is no evidence that he suffered sufficiently serious medical injuries that have been caused or aggravated by exposure to ETS. Eldridge v. Williams, 2013 WL 4005499, *11 (S.D.N.Y. 2013) (the plaintiffs' alleged injuries which included "asthmatic conditions usually assessed as 'mild intermittent,' . . . and/or symptoms such as headaches, irritated and watery eyes, and breathing problems" did not rise to the level of seriousness as required to violate the Eighth Amendment). *See also* Gill v. Bracey, 2001 WL 34045758, *4 (S.D.N.Y. 2001) (granting the defendants summary judgment, where "[a]t the most, [the plaintiff] suffered from asthmatic bronchitis . . . a treatable infection" while allegedly exposed to ETS). *Compare with* Gill v. Smith, 283 F. Supp. 2d 763, 768 (N.D.N.Y. 2003) (denying summary judgment where the plaintiff experienced a "documented . . . asthma attack after an alleged" exposure to ETS); Eldridge, 2013 WL 4005499, *10 (where the

plaintiff's medical records included "hospitalizations and difficulty sleeping due to ETS exposure", there existed an issue of material fact as to whether one of the plaintiffs suffered from sufficiently serious injuries to meet the objective prong).  Therefore, I recommend that this portion of Hughes' motion for summary be granted.

        2.        **Future Harm**

In Helling, supra, the Supreme Court recognized that a prisoner's claim that he or she was exposed to levels of second-hand smoke that pose an unreasonable risk of serious damage to his future health is cognizable under the Eighth Amendment.  In order to succeed on an ETS claim alleging future harm, a plaintiff must establish both an objective and a subjective element. "In contrast to a claim of present harm from ETS, the focus in a claim of future harm from ETS is not on whether the plaintiff has sought treatment or complained of ailments associated with exposure to ETS." Grayson v. Courtney, 2018 WL 6933296, *9 (N.D.N.Y. 2018), adopted, 2019 WL 110951 (N.D.N.Y. 2019).

To satisfy the objective element, a plaintiff "must show that he himself is being exposed to unreasonably high levels of ETS" that "pose an unreasonable risk of serious damage to his future health. Helling, 509 U.S. at 35. See Eldridge, 2013 WL 4005499, *7. "[D]etermining whether [the] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Id. at 36 (emphasis in original). See also Pack v. Artuz, 348 F. Supp.

2d 63, 90 n.32 (S.D.N.Y. 2004) ("to violate contemporary standards of decency, the risk must apply to anyone who is subjected to the . . . exposure - not just individuals who are genetically predisposed to cancer"). Hence, to establish his claim, "plaintiff must prove that such exposure to smoke posed an unreasonable risk to his current or future health, that such compelled exposure was sufficiently serious to be intolerable according to current standards of decency and that the defendant was deliberately indifferent to the plaintiff's plight". Blyden v. Bartlett, 1997 WL 584308, *2 (W.D.N.Y. 1997). See also Klein v. Fischer, 2015 WL 5174031, *21 (N.D.N.Y. 2015) ("[t]o show that a risk was objectively unreasonable, an inmate must establish that he is being exposed to unreasonably high levels of ETS, *and* that the risk to his health is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk" (emphasis added)).

"Courts have generally found ETS exposure to be unreasonably high mainly when the plaintiff shares a cell with an inmate who is a frequent or chain smoker, or when the plaintiff is housed in a cell surrounded by such smokers." Eldridge, 2013 WL 4005499, *8. For example, plaintiff points to Shepherd v. Hogan, 181 Fed. App'x 93 (2d Cir. 2006), where the plaintiff "was imprisoned in close quarters with a chain smoker for more than a month". Id. at 95.[7] Plaintiff's Memorandum of Law [106-1], p. 5. Under those circumstances, the Second Circuit concluded that "[e]ven if [the plaintiff] often left his cell during the day . . . he shared a confined space with a chain smoker at night and for a period of several days of 'keeplock.' The prison's own policies indicate that this is inappropriate treatment, and the prison's grievance

---

[7] Although not raised by Hughes, the Second Circuit's Local Rules state that "[r]ulings by summary order do not have precedential effect" and generally prohibit parties from citing summary orders issued before January 1, 2007. *See* Second Circuit Local Rule 32.1.1(b)(2); United States v. Hatfield, 795 F. Supp. 2d 219, 230 (E.D.N.Y. 2011) ("[t]his Court has never really understood the Second Circuit's refusal to let parties cite pre–2007 summary orders as even persuasive authority. But the Court must respect the Second Circuit's wishes").

committee so concluded. These facts support the conclusion that the risk Shepherd allegedly suffered was 'not one that today's society chooses to tolerate.'" Id. (*quoting* Helling, 509 U.S. at 36). *See also* Davis v. State of New York, 316 F.3d 93, 100-01 (2d Cir. 2002) (plaintiff's experience of having a cellmate who smoked and being housed in areas where he was surrounded by smokers, such that "the smell of smoke fills the air and enter[s] my cell in a manner as though I was myself smoking" was sufficient to create a genuine issue of fact to sustain an Eighth Amendment claim); Scott, 2006 WL 1994757, *5 (where the "plaintiff has alleged that despite ventilation systems, he was surrounded by smokers in a dormitory setting. He states that a cloud of smoke hung visibly in the air. Although the living areas at Oneida and Livingston are not alleged to be 'poorly ventilated,' the court cannot say that the level of ETS was not unreasonable given the large number of smoking inmates in a common living area").

While plaintiff may have had greater exposure to second-hand smoke than the plaintiff in Shepherd, he must still establish that such exposure posed an unreasonable risk of serious damage to his future health to satisfy the objective prong. *See* Thomas v. New York State Department of Correctional Services, Division of Correctional Industries, 2006 WL 435718, *5 (S.D.N.Y. 2006) ("plaintiff must demonstrate that he was exposed to an unreasonably high level of a dangerous substance *and* that this exposure posed an 'unreasonable risk of serious damage to his future health'" (emphasis added)); Islam v. Connolly, 2011 WL 723568, *3 (S.D.N.Y. 2011) ("[w]ith respect to the objective prong, plaintiff must come forward with some evidence from which a reasonable jury could find that 'he himself is being exposed to unreasonably high levels of ETS.' . . . Also with respect to the objective prong, the plaintiff must come forward with some evidence from which a reasonable jury could find that the risk to his health is sufficiently serious and 'not one that today's society chooses to tolerate'"); Johnson v. Goord,

2005 WL 2811776, *4 (S.D.N.Y. 2005) ("[t]o defeat defendants' motion on the objective prong, plaintiffs must come forward with some evidence from which a reasonable jury could find in their favor on their assertions that (1) they have been exposed to unreasonably high levels of ETS, *and* (2) the risk to their health posed by such exposure is significantly serious and 'is not one that today's society chooses to tolerate'" (emphasis added)). In fact, plaintiff himself previously acknowledged that establishing that his "'exposure to [ETS] posed an unreasonable risk of serious damage to his future health, [is] an essential element of [his] claim'". Smith v. Bradt, 329 F.R.D. 500, 503 (W.D.N.Y. 2019).

    However, plaintiff's *own* expert, Dr. Buscaglia, undermines this essential element of his claim (*i.e.*, that his exposure to second-hand smoke posed an unreasonable risk of serious damage to his future health) by opining that he "would not anticipate any change in [plaintiff's] diagnosis or condition based on the relatively short duration of the exposure". [107], p. 13 of 13 (CM/ECF).  Therefore, plaintiff has not satisfied the objective prong of his claim.  *See* Jones v. Artuz, 2006 WL 2390267, *5–6 (S.D.N.Y. 2006) (concluding that "[p]laintiff has failed to provide evidence of either a present asbestos-related injury, or a risk of developing a future injury, where the defendants' expert concluded that "'[g]iven the alleged exposure and [the plaintiff's] medical condition as revealed by his medical records, [the plaintiff is not likely to develop any asbestos-related disease in the future'"); Crawford v. Artuz, 143 F. Supp. 2d 249, 260–61 (S.D.N.Y. 2001) (same); Phillips v. Plunkett, 2006 WL 839185,  *10 (E.D. Mo. 2006), aff'd, 250 Fed. App'x 189 (8th Cir. 2007) ("plaintiff has failed to present evidence showing how his exposure to ETS would affect his future health. Plaintiff has produced no expert medical testimony to establish that he faces an increased risk of developing a serious medical condition or that the risk was caused by exposure to ETS while he was confined at the . . . Jail").  This

individualized showing of a risk of future harm is required, or else it would render "ETS cases strict liability; once an inmate showed that he was exposed to secondhand smoke, his burden of proof is satisfied because exposure generally means increased health risks". Durham v. Lappin, 2010 WL 918066, *5 (D.Colo. 2010). *See also* Klein, 2015 WL 5174031, *22 ("[t]he inquiry under Helling is . . . whether *Plaintiff's particular exposure to ETS caused him to suffer a greater risk of harm*" (emphasis added)).[8]

"[T]he medical effects of secondhand smoke are not within the ken of the ordinary person". Goffman v. Gross, 59 F.3d 668, 672 (7th Cir. 1995). Since plaintiff has presented no medical evidence supporting his claim of future harm and the medical evidence he does rely upon undermines that claim, I recommend that Hughes' motion for summary judgment be granted. *See* Gill, 2001 WL 34045758, *4 ("a 'scientific inquiry' into the severity of the harm Gill suffered from ETS is necessary to sustain his claim . . . . Although Gill contends otherwise, he has offered no scientific or medical evidence . . . of serious damage to his present or future health . . . . Plaintiff has failed, therefore, to establish the objective element of the alleged Eighth Amendment violation").

---

[8] Hughes' motion is accompanied by the Declaration of PA Schunk. Although plaintiff argues that PA Schunk's testimony should be "deemed inadmissible" due to Hughes' failure to disclose her as an expert and the "lack of foundation as to [her] ability to render such opinions" (plaintiff's Memorandum of Law [106-1], p. 7), it is unnecessary for me to resolve that issue, since Hughes can satisfy his burden by pointing to the absence of evidence to support an essential element of plaintiff's claim. *See* Celotex, 477 U.S. at 322–23; McIntyre v. Robinson, 126 F. Supp. 2d 394, 403 (D. Md. 2000) ("[b]earing in mind that Plaintiffs have the burden of proof on the unreasonable risk to future health claim, they are not entitled to summary judgment unless they can 'remove genuine doubt' as to every element of that claim. . . . . Indeed, even if Defendants come forward with no evidence at all, summary judgment in favor of Plaintiffs may still be inappropriate if their evidence is 'too scanty to justify rendering judgment' in their favor").

## CONCLUSION

For these reasons, I recommend that Hughes' motion for summary judgment [99] be granted. Unless otherwise ordered by District Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by January 28, 2020.

Any requests for extension of this deadline must be made to District Judge Sinatra. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: January 14, 2020

        /s/ Jeremiah J. McCarthy
        JEREMIAH J. MCCARTHY
        United States Magistrate Judge